**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM BURGESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-cv-01455-MTS |
| | ) | |
| ANNE L. PRECYTHE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter comes before the Court on the motion of plaintiff, William Burgess, for leave to commence this civil action without prepayment of the required filing fee. Doc. [3]. Having reviewed the motion and the financial information submitted in support, the Court has determined that plaintiff lacks sufficient funds to pay the entire filing fee, and will assess an initial partial filing fee of $9.93. *See* 28 U.S.C. § 1915(b)(1). Additionally, for the reasons discussed below, the Court will direct plaintiff to file an amended complaint on a Court form.

**28 U.S.C. § 1915(b)(1)**

Pursuant to 28 U.S.C. § 1915(b)(1), a prisoner bringing a civil action in forma pauperis is required to pay the full amount of the filing fee. If the prisoner has insufficient funds in his or her prison account to pay the entire fee, the Court must assess and, when funds exist, collect an initial partial filing fee of 20 percent of the greater of (1) the average monthly deposits in the prisoner's account, or (2) the average monthly balance in the prisoner's account for the prior six-month period. After payment of the initial partial filing fee, the prisoner is required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. 28 U.S.C. § 1915(b)(2). The agency having custody of the prisoner will forward these monthly

payments to the Clerk of Court each time the amount in the prisoner's account exceeds $10.00, until the filing fee is fully paid. *Id.*

In support of his motion for leave to proceed in forma pauperis, plaintiff submitted a copy of his certified inmate account statement. Doc. [6]1 at 8. The account statement shows an average monthly deposit of $49.65. The Court will therefore assess an initial partial filing fee of $9.93, which is 20 percent of plaintiff's average monthly deposit.

## Legal Standard on Initial Review

Under 28 U.S.C. § 1915(e)(2), the Court is required to dismiss a complaint filed in forma pauperis if it is frivolous, malicious, or fails to state a claim upon which relief can be granted. To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a plausible claim for relief, which is more than a "mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw upon judicial experience and common sense. *Id.* at 679. The court must "accept as true the facts alleged, but not legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). *See also Brown v. Green Tree Servicing LLC*, 820 F.3d 371, 372-73 (8th Cir. 2016) (stating that court must accept factual allegations in complaint as true, but is not required to "accept as true any legal conclusion couched as a factual allegation").

When reviewing a pro se complaint under § 1915(e)(2), the Court must give it the benefit of a liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). A "liberal construction" means that if the essence of an allegation is discernible, the district court should construe the

plaintiff's complaint in a way that permits his or her claim to be considered within the proper legal framework. *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015). However, even pro se complaints are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980). *See also Stone v. Harry*, 364 F.3d 912, 914-15 (8th Cir. 2004) (stating that federal courts are not required to "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint"). In addition, affording a pro se complaint the benefit of a liberal construction does not mean that procedural rules in ordinary civil litigation must be interpreted so as to excuse mistakes by those who proceed without counsel. *See McNeil v. United States*, 508 U.S. 106, 113 (1993).

### The Complaint

Plaintiff is a self-represented litigant who is currently incarcerated at the Eastern Reception, Diagnostic and Correctional Center (ERDCC) in Bonne Terre, Missouri. He brings this civil action pursuant to 42 U.S.C. § 1983. The complaint names twenty separate defendants: Director Anne L. Precythe; Warden Stan Payne; Associate Warden Matt Pultz; Assistant Warden Julie Bell; Functional Unit Manager (FUM) Theodore Eaton; Sergeant Taylor; Correctional Officers Ferrel, Daum, Harvey, Fields, Bray, Wideman, Haucke, Amsden, Cook, and two separate officers named Lesage; Nurse Shanta Coffman; Director of Nursing Danielles; and Assistant Director of Nursing Katie Tyler. Doc. [1] at 1-3. Plaintiff does not indicate the capacity in which he is suing Director Precythe or Warden Payne. All other defendants are sued in both their individual and official capacities. The substance of plaintiff's complaint concerns the handling of the COVID-19 pandemic at the ERDCC.[1]

---

[1] COVID-19 is the name of the disease caused by the novel coronavirus known as SARS-CoV-2, which originated in China, and has spread globally, resulting in the declaration of a national emergency. *See* Pres. Proc. No. 9994, 85 Fed. Reg. 15337, 2020 WL 1272563 (Mar. 13, 2020). In the United States, the virus has resulted in hundreds of thousands of cases, and tens of thousands of deaths. *See In re Rutledge*, 956 F.3d 1018, 1023 (8th Cir. 2020).

Plaintiff states that on July 26, 2020, his cellmate "went to medical for sick call and discovered he was positive with COVID-19." Doc. [1] at 3. After being diagnosed by a nurse, the cellmate was sent back to the housing unit. Officer Case approached plaintiff and told him that he had to lockdown with his cellmate. Plaintiff alleges that he was "recklessly" placed "in the cell with [his] infectious [cellmate] for about 9 to 10 hours," without being screened himself to determine if he had COVID-19.

At 12:00 a.m., Officer Wideman told plaintiff and his cellmate to pack their property because they were being moved to Housing Unit 10, which was being used to handle COVID-19 inmates. Plaintiff states that he was placed on the D-wing of Housing Unit 10, which was for "possible COVID-19 offenders." Doc. [1] at 3-4. He further asserts that he was a "Level 5 Offender being housed with Custody Level 1 Offender(s)." Doc. [1] at 4.

Plaintiff explains that Housing Unit 10 houses at least twenty offenders, and that they were being kept in single-person cells. He states that the unit had "only" two shifts of "specially assigned officers" working twelve-hour shifts. Plaintiff identifies these officers as Officers Daum, Ferrel, Lee, and Harvey, who worked from seven a.m. to seven p.m., and Officers Haucke, Wideman, Amsden, Lesage, and Lesage, who worked from seven p.m. to seven a.m. He states that the only case management officer they could speak to was FUM Williams, but that they never actually got to speak with Williams.

On July 27, 2020, plaintiff was seen by a nurse and told that he would be tested for COVID-19; two weeks after being quarantined. Plaintiff states that he was not given any further information, except being told that he was being held in quarantine so "they would know" if something were to happen to him. He also complains that he "was refused both nurses['] names"

4

and that the "nurses never wore badges," though he acknowledges that they were "wearing protective gear that covered their clothing."

Plaintiff next states that the seven a.m. to seven p.m. "officers treated us like trash," that "they didn't care at all and went out of [their] way to show us they didn't care." In particular, he asserts that Officers Daum and Ferrel intentionally denied him bleach and plastic gloves, and that officers did not do anything about offenders not wearing masks, mingling in large groups, or using the telephones without wiping them down with bleach. With regard to Officers Wideman and Haucke, plaintiff states that they tried to answer inmate "questions as best they could without having direct knowledge of what went on or was going on."

From July 27, 2020 to August 1, 2020, plaintiff states that "the showers were never cleaned," even after being used by inmates who were positive for COVID-19. Doc. [1] at 5. Diagnostic offenders had to wear the same clothing for three weeks to a month, with "[n]o change of underclothes or state issued pants or jumpsuits." As a result, plaintiff states that "a lot" of inmates were dirty and malodorous.

On July 29, 2020, after plaintiff started asking for grievance forms, "the staff issued a warning" that the inmates had to "start exercising social distancing by staying 6 [feet] apart and wearing our mask[s]." According to plaintiff, this occurred after "a few of the guys in the wing tested positive" for COVID-19. Plaintiff states that a "couple" of the positive inmates were moved, but at least three stayed. Of these three, plaintiff acknowledges that only two had been tested, but that the third was "truly believed to be ill."

On July 31, 2020, plaintiff requested an opportunity to speak with the FUM or the Housing Unit lieutenant, because plaintiff believed that "a few" inmates who were positive for COVID-19 were being left "intentionally" in the wing with inmates who only potentially had COVID-19. On

that same day, he requested protective custody. However, Officer Ferrel told him that he could not go to protective custody because he was in a single-person cell and that there was no place to put him, except for the "hole." Plaintiff admits to making "several threats" toward Officer Ferrel, but he "was still ignored."

During the night, plaintiff's "neighbor was so sick and coughing everywhere" that plaintiff "panicked" and decided to do something to get himself "locked down behind a door." On August 1, 2020, during the six a.m. count, plaintiff asserts that he "went downstairs and stood in plain view of the wing and bubble where officers were at, and started openly masturbating." Three hours later, Officer Wideman escorted plaintiff to the new quarantine unit in Housing Unit 7. Doc. [1] at 5-6.

Plaintiff states that in Housing Unit 7, he had no contact with anyone but the specially assigned officers, as well as with the nurses who brought medications and screened the inmates. Doc. [1] at 6. He asserts that he had no communication with classification, no outside recreation, and that no laundry was being done. He further states that he was not given bleach water or disinfectant to clean his cell. Plaintiff also complains that Housing Unit 7 was "filled up with general population" inmates "who were tested and confirmed to be positive with COVID-19." He alleges that the staff treated them badly, as if they "were all going to die." He contends that he was "intentionally served cold foods" or snack bags, because "the staff knew that hot liquids and hot foods helped kill [the] corona virus."

While in Housing Unit 7, plaintiff states that he "started experiencing complications with the left side of [his] body." Specifically, his ankle would not bend, and his left arm went numb and began tingling. He reported this to Officer Fields, Officer Lesage, and a nurse, "all of whom really

ignored me." According to plaintiff, these "complications" lasted for two to three weeks, and that medical personnel did nothing for him but take his vitals and temperature on a daily basis.

On August 10, 2020, general population inmates were moved from Housing Unit 7, which is on the diagnostic side, to Housing Unit 1, on the general population side. Plaintiff believes this was "only done" because his mother complained about him being housed in Housing Unit 10 and Housing Unit 7. He states that he knows "for sure" that he "caught the virus in Housing Unit 10" because he "lost [his] sense of smell and [his] appetite" on July 29, 2020.

In Housing Unit 1, plaintiff asserts that "the staff tried to put everyone in double man cells." Doc. [1] at 7. As a quarantine measure, inmates who were positive with COVID-19 were celled together, while those who were only potentially positive were also celled together. Plaintiff states that he was only "a possible," but he "was certainly sick with corona." Thus, he refused to accept a cellmate and was placed in a cell by himself.

Plaintiff states that he and other inmates were treated "worse" in Housing Unit 1 than the other units. He asserts that "the staff literally left us in this unit for about 5 hours with no one conducting a security check." After being moved into the unit, he did not eat until twelve a.m. the next day, because "the staff actually forgot to feed us dinner." He alleges that "[w]e did not receive our medication for the next 3 days," including inmates who needed insulin shots. Further, plaintiff states that "the officers were literally being mean" and would not answer questions.

On August 12, 2020, plaintiff turned in an "emergency grievance" and sent copies to Human Rights Watch. Then he turned in a second "emergency grievance" and sent a copy of that to Channel 11 News. Plaintiff has attached a purported copy of his grievance to his complaint. Doc. [1] at 8-10. In the grievance, plaintiff alleges that the Missouri Department of Corrections

was attempting to "murder" inmates by "intentionally infecting its prison(s) offender(s) with the deadly virus COVID-19." Doc. [1] at 8.

Plaintiff alleges that the staff "intentionally "infected" offenders at the ERDCC with COVID-19, and have failed to intervene to stop the virus's spread. Doc. [1] at 11. He claims that this was done maliciously and sadistically in violation of the Eighth Amendment. He further states that failing to test inmates who were possibly infected, and allowing "them to circulate in an open bay with others," constituted deliberate indifference. Finally, he contends that the "refusal" of the medical staff to "properly treat and examine the COVID-19 offenders" constitutes negligence under Missouri law.

Plaintiff seeks injunctive relief against Director Precythe that would order her to "stop infecting offenders," arrange for plaintiff to be examined, to "arrange for immediate therapy or treatment" to "ensure the restoration of plaintiff's natural health," and to carry out "any treatments directed by a medical doctor or medical practitioner with expertise in the treatment and care of such patients." Doc. [1] at 12. With regard to Warden Payne, plaintiff seeks an injunction ordering him to release plaintiff from administrative segregation, and to expunge plaintiff's disciplinary report from his institutional record. He also seeks compensatory and punitive damages. Doc. [1] at 13.

### Subsequent Filings

On October 21, 2020, after the filing of his complaint, plaintiff submitted two separate documents. The first was titled "Declaration in Support of Offender William Burgess's Claim of Attempt to Murder." Doc. [5]. In the declaration, plaintiff states that on September 29, 2020, FUM Eaton, Nurse Tyler, and Nurse Renshaw were all in the administrative segregation unit of Housing Unit 2. With no other factual allegations, save their presence, plaintiff asserts that they were

8

"possibly passing out the COVID-19 virus, by conducting random test[s] on offenders in segregation." Plaintiff also passes on hearsay from an unnamed inmate that "staff was locking up suspected COVID-19 offenders" in Housing Unit 2, "trying to infect them with COVID-19."

The second document plaintiff filed on October 21, 2020 was titled "Declaration in Support of Offender William Burgess's Claim of Denial of Access to the Courts." Doc. [6]. In this declaration, plaintiff alleges that staff at the ERDCC was hindering and interfering with his access to the courts, specifically with regard to retrieving copies of his grievances and in receiving grievance appeals forms.

On November 12, 2020, plaintiff submitted the "Declaration of Shyheim Deen El-Mu'Min." Doc. [7]. This purports to be a statement from an inmate at the ERDCC who witnessed a correctional officer named Wallace threaten to retaliate against plaintiff for the filing of a Prison Rape Elimination Act (PREA) complaint against him.

That same day, plaintiff also filed another declaration that he had authored, accusing Officer Wallace of PREA violations and retaliation. Doc. [3]. Officer Wallace was not named as a defendant in the original complaint.

## Discussion

Plaintiff is a self-represented litigant who brings this civil action pursuant to 42 U.S.C. § 1983. For the reasons discussed below, the complaint is deficient and subject to dismissal. However, the Court will allow plaintiff to file an amended complaint pursuant to the instructions set forth in this order.

### A.  Deficiencies in Complaint

Plaintiff's complaint is deficient and subject to dismissal for several reasons. First, the complaint is not on a Court-provided form, as required. *See* E.D. Mo. L.R. 2.06(A) ("All actions brought by self-represented plaintiffs or petitioners should be filed on Court-provided forms").

Second, plaintiff has not provided a short and plain statement showing that he is entitled to relief. *See* Fed. R. Civ. P. 8(a). Instead, in his rather lengthy complaint, plaintiff relates irrelevant material, appears to be bringing claims on behalf of other inmates, and engages in unsupported speculation that staff members are attempting to murder inmates by intentionally spreading COVID-19.

Third, plaintiff has not demonstrated the personal responsibility of each defendant for violating his constitutional rights. *See S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) (stating that "[g]overnment officials are personally liable only for their own misconduct"). Indeed, some of the defendants named in the complaint do not even appear in the "Statement of Claim." Others appear, but have no factual allegations against them. Meanwhile, plaintiff also mentions individuals in the "Statement of Claim" and his subsequent declarations who are not properly named as defendants.

Fourth, plaintiff relies heavily on conclusory statements and speculation, rather than presenting factual allegations as to what the defendants did and did not do. Such conclusory pleading is insufficient to state a claim, as plaintiff must present facts that are adequate to "raise a right to relief above the speculative level." *See Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017).

Finally, since filing his complaint, plaintiff has submitted four other declarations that include additional claims. Some of these claims, such as his denial of access to the courts, and the alleged PREA violations, are not related to his original claims regarding the handling of COVID-

19 at the ERDCC. Plaintiff should only include claims that are related to each other. *See* Fed. R. Civ. P. 20(a)(2). Furthermore, the Court will not allow plaintiff to supplement his claim in a piecemeal fashion. Instead, plaintiff must bring all his claims in a single complaint.

Because plaintiff is a self-represented litigant, he will be given the opportunity to file an amended complaint according to the instructions set out below.

### B.  Amendment Instructions

Plaintiff should type or neatly print his amended complaint on the Court's civil rights form, which will be provided to him. *See* E.D. Mo. L.R. 2.06(A) ("All actions brought by self-represented plaintiffs or petitioners should be filed on Court-provided forms"). If the amended complaint is handwritten, the writing must be legible. Plaintiff should fill out the complaint form in its entirety, using additional sheets as necessary if he runs out of space.

In the "Caption" section of the Court-provided form, plaintiff should clearly name each and every party he is intending to sue. *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties"). If there is not enough room in the caption, plaintiff may add additional sheets of paper. However, all the defendants must be clearly and individually listed. Plaintiff must also indicate the employer for each defendant. He may not assert allegations against persons who have not been properly named and identified as defendants.

In the "Statement of Claim" section, plaintiff should provide a short and plain statement of the factual allegations supporting his claim. *See* Fed. R. Civ. P. 8(a). Plaintiff should put each claim into a numbered paragraph, and each paragraph should be "limited as far as practicable to a single set of circumstances." *See* Fed. R. Civ. P. 10(b).

The amended complaint should only include claims that arise out of the same transaction or occurrence. In other words, plaintiff should only include claims that are related to each other.

11

*See* Fed. R. Civ. P. 20(a)(2). Alternatively, plaintiff may choose a single defendant and set forth as many claims as he has against that defendant. *See* Fed. R. Civ. P. 18(a). The Court will not allow plaintiff to bring multiple unrelated claims against multiple defendants. If plaintiff has additional claims that are not related to those in his amended complaint, he may file those in a separate case, on the appropriate Court form.

In structuring his amended complaint, plaintiff should begin by writing the defendant's name. In separate, numbered paragraphs under that name, plaintiff should write a short and plain statement of the factual allegations supporting his claim against that specific defendant. If plaintiff is suing more than one defendant, he should follow the same procedure for each defendant.

Plaintiff must specify whether he intends to sue each defendant in an official capacity, an individual capacity, or both. The failure to sue a defendant in his or her individual capacity may result in the dismissal of that defendant.

If plaintiff is suing a defendant in an individual capacity, he is required to allege facts demonstrating the personal responsibility of the defendant for harming him. *See Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990) (stating that § 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights"). Furthermore, the Court emphasizes that the "Statement of Claim" requires more than "labels and conclusions or a formulaic recitation of the elements of a cause of action." *See Neubauer v. FedEx Corp.*, 849 F.3d 400, 404 (8th Cir. 2017).

If plaintiff is suing multiple defendants, it is important that he establish the responsibility of each separate defendant for harming him. That is, for each defendant, plaintiff must allege facts showing how that particular defendant's acts or omissions violated his constitutional rights. It is not enough for plaintiff to make general allegations against all the defendants as a group. Rather,

plaintiff needs to provide the role of each named defendant in this case, in order that each specific defendant can receive notice of what he or she is accused of doing. *See Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (stating that the essential function of a complaint "is to give the opposing party fair notice of the nature and basis or grounds for a claim").

Plaintiff is warned that the filing of an amended complaint **completely replaces** the original complaint. This means that claims that are not re-alleged in the amended complaint will be deemed abandoned. *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 928 (8th Cir. 2005) ("It is well-established that an amended complaint supercedes an original complaint and renders the original complaint without legal effect").

After receiving the amended complaint, the Court will review it pursuant to 28 U.S.C. § 1915. Plaintiff's failure to make specific factual allegations against a defendant will result in the dismissal of that defendant. If plaintiff fails to file an amended complaint on a Court-provided form within thirty days in accordance with the instructions set forth herein, the Court will dismiss this action without prejudice and without further notice to plaintiff.

### C.  Motion to Appoint Counsel

Plaintiff has filed a motion to appoint counsel. Doc. [2]. In civil cases, a pro se litigant does not have a constitutional or statutory right to appointed counsel. *Ward v. Smith*, 721 F.3d 940, 942 (8th Cir. 2013). *See also Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998) (stating that "[a] pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case"). Rather, a district court may appoint counsel in a civil case if the court is "convinced that an indigent plaintiff has stated a non-frivolous claim…and where the nature of the litigation is such that plaintiff as well as the court will benefit from the assistance of counsel." *Patterson v. Kelley*, 902 F.3d 845, 850 (8th Cir. 2018). When determining whether to appoint counsel for an indigent

litigant, a court considers relevant factors such as the complexity of the case, the ability of the pro se litigant to investigate the facts, the existence of conflicting testimony, and the ability of the pro se litigant to present his or her claim. *Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006).

After reviewing these factors, the Court finds that the appointment of counsel is not warranted at this time. Plaintiff has demonstrated, at this point, that he can adequately present his claims to the Court. Additionally, neither the factual nor the legal issues in this case appear to be complex. The Court will entertain future motions for appointment of counsel as the case progresses.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for leave to proceed in forma pauperis, Doc. [3] is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff must pay an initial filing fee of $9.93 within **thirty (30) days** of the date of this order. Plaintiff is instructed to make his remittance payable to "Clerk, United States District Court," and to include upon it: (1) his name; (2) his prison registration number; (3) the case number; and (4) the statement that the remittance is for an original proceeding.

**IT IS FURTHER ORDERED** that plaintiff's motion for appointment of counsel, Doc. [2] is **DENIED** at this time.

**IT IS FURTHER ORDERED** that the Clerk of Court shall send to plaintiff a copy of the Court's prisoner civil rights complaint form.

**IT IS FURTHER ORDERED** that plaintiff shall file an amended complaint on the Court form according to the instructions set forth herein within **thirty (30) days** of the date of this order.

14

**IT IS FURTHER ORDERED** that if plaintiff fails to submit an amended complaint within **thirty (30) days** of the date of this order, this action will be dismissed without prejudice and without further notice.

**IT IS FURTHER ORDERED** that upon receipt of plaintiff's amended complaint, the Court will review it pursuant to 28 U.S.C. § 1915.

Dated this 15th day of December, 2020

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE